[Crim. No. 1757. Second Appellate District, Division Two.—April
10, 1929.]

THE PEOPLE, Respondent, v. J. M. KUDER et al., De-
fendants; STEPHEN BEDFORD, Appellant.

Raymond E. Hodge and William Guthrie for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, and Warner I. Praul for Respondent.

CRAIG, J.—This case was before us on motion to dismiss an appeal by the People (*People* v. *Kuder et al.*, 90 Cal. App. 594 [266 Pac. 337]), and upon the merits of that appeal, the same being from an order granting a motion in arrest of judgment (*People* v. *Kuder et al.*, 93 Cal. App. 42 [269 Pac. 198; Id., 93 Cal. App. 55 [269 Pac. 630]).

It appears that during the month of July, 1925, a corporation named Fishelton Farms, Incorporated, was incorporated under the laws of this state by J. M. Kuder, Edward B. Fishel, U. R. Fishel, C. G. Luke and Stephen Bedford, appellant herein. In August of the same year, by a petition verified by J. M. Kuder, filed with the commissioner of corporations, it was recited among other things that the corporation was organized with a capital stock of $25,000, divided into 250 shares of the par value of $100 each, which the incorporators agreed to subscribe and pay for in cash, and prayed leave to issue and sell the whole thereof to said incorporators at par, without payment of brokerage. A permit was thereafter issued, authorizing Fishelton Farms, Inc., a California corporation, to sell and issue to its five incorporators an aggregate of 250 shares of its capital stock at par, for cash, so as to net the applicant the full amount of the selling price thereof.

The appellant and his co-incorporators were subsequently indicted by the grand jury of San Bernardino County, and charged with having violated the Corporate Securities Act, a felony. Specifically, they were alleged to have wilfully, unlawfully, knowingly, fraudulently and feloniously authorized and directed and aided in the issue and sale of, and caused and assisted in causing to be issued, executed and sold, 246 shares of the capital stock of said corporation,

without paying, remitting or delivering to the corporation, or demanding, obtaining or receiving for and on its behalf, or paying, remitting or delivering thereto, cash, so as to net it the full amount of the selling price of said shares as provided by the terms of the permit, with intent to avoid and violate the terms thereof, contrary to the uses and purposes to which the petition of the applicant had represented to the commissioner of corporations that the proceeds of sale should be applied. Briefly stated, the grand jury charged the defendants with having issued to themselves $24,600 worth of corporate stock without paying anything therefor, but for which they agreed as a basis for obtaining a permit, and were accordingly directed to pay to the corporation full cash value at par. Pursuant to a trial upon the foregoing charges, a verdict was returned reciting that "the jury in the above entitled action, find the defendant guilty as charged in the indictment." The trial court, following the proceedings therein and in the appellate tribunals, as above recited, ruled that: "This is not a felony. They are guilty of a misdemeanor. They are not guilty of a felony. . . . I think the law is clear enough that the penalty determines the degree of the crime," and assessed a fine of $500 in each instance, with the alternative of being imprisoned in the county jail one day for each $2 thereof. The defendant Stephen Bedford appealed "from the order . . . denying his motion for a new trial, and from the judgment rendered in this cause."

The appellant's argument is premised by quoting the indictment as a "statement of the offense," and a presentation of certain exhibits introduced upon the trial which it is asserted constitute all of the evidence against him. The exhibits in their numerical order, as introduced by the People consist of the following: (1) A book entry showing assets in the nature of a poultry business in Indiana inventoried at $34,990, and one in California inventoried at $33,319.64; liabilities $23,869.46, surplus $44,440.18; and reciting that the poultry business was purchased from J. M. Kuder for $25,000 by Fishelton Farms, Inc., whose entire authorized capital stock of $25,000 was sold to the five incorporators for cash, with the agreement that the corporation should pay the liabilities above mentioned, all "as set forth in the following balance sheet," which latter does

not exist. (2) Certain book entries showing credits to· the corporation by issuance of stock, $24,600 to Kuder, and $100 to each of the other incorporators, with corresponding debits of like amounts appearing as cash in bank received from the same persons on the same date. Also entries, "Purchase price $24,600," "Stephen Bedford, legal services, $100," and $100 to each of the other incorporators for services rendered. (3) Stock journal, showing stock certificates issued, of which appellant received one share. (4) Minutes of directors' meeting, authorizing purchase of certain real and personal property from Kuder at· $24,600 cash and promissory note of $12,000, and payments for services above noted. (5) Stock certificate book showing issuance of said shares. (6) Articles of incorporation. (7) Application of the corporation for permit, and (8) the permit, to issue stock. (11) Five bank checks in favor of Kuder in the sum of $24,600, and $100 each to the other incorporators. (12) Ledger sheet, bearing entries to account of the corporation of a deposit of $25,000 on September 30, 1925, and issuance on the same date of the checks last mentioned, leaving "Balance .00," and deposit to the company's credit on October 2, 1925, of $6.10. (13) Loose leaf ledger sheet account of Stephen Bedford, consisting of a deposit September 30, 1925, of $100, and corresponding withdrawal of the same amount by check on the same date, leaving "Balance, .00." (14, 15, 16) Like accounts of others of the incorporators, including J. M. Kuder, "deposit $24,600, checks $24,600, balance .00," on September 30, 1925. (17) "San Bernardino Valley Bank, Deposit of Fishelton Farms, Inc.," deposit slip of the same date last mentioned, of checks received from the incorporators, four of $100 each, and one of $24,600. (18, 19, 20, 21, 22) Five individual deposit slips, showing deposits in the same bank on the same date to their respective private accounts of similar amounts, including "Stephen Bedford 9–30–25 Check $100.00."

The case was prosecuted upon the theory that as to appellant herein, a certificate for one share of stock for which he was required by the permit to pay cash, was issued to him; that he deposited in an account wherein he had no funds, a check of the corporation for $100 which his co-incorporators issued against its account which had no funds, and that appellant in turn gave to the corporation as an ostensible

payment for his share of stock a personal check for $100, which merely offset the worthless check of the corporation. In short, it was contended by the People, and the evidence strongly tends to show without contradiction, that the whole purpose of the incorporators was to mulct the corporation of the entire issue of $25,000 in capital stock without payment of one dollar of cash or credit. The purported entries tend to indicate that appellant received $100 by check for legal services in incorporating the Fishelton Farms, Inc., which he deposited in its bank, and immediately checked out in its favor for his one share of capital stock. All the respective accounts consist of contemporaneous credits and debits, in spite of which there were no funds ever in the possession of the bank, and it requires no degree of expert bookkeeping to reveal the fact that it received nothing and disbursed nothing through the checking system of the depositors, and the corporation received nothing for the certificate of stock issued to appellant.

No evidence was offered by the defendant Bedford, except through witnesses who testified to his previous good character, and through the briefs there is no attempted denial of the facts as herein recited.

It is first contended that the Corporate Securities Act (Stats. 1917, p. 673), does not make it unlawful to pay to the corporation cash for its capital stock, or to use cash obtained from the sale thereof for purposes other or contrary to those recited in the application, or to issue or sell shares of stock without demanding or receiving cash for capital stock; that it does provide that it is a crime to violate any provision of a permit, but that the permit here involved does not require that persons receiving its stock shall pay cash therefor to the corporation, or that the corporation shall use the cash so obtained for the uses and purposes recited in the application. It is sufficient answer to this argument, however, that the articles of incorporation specified the purposes of the corporation, its application for permit stated under oath that the proceeds of sales of stock for full cash value, at par, would be devoted to those purposes, and the permit itself was issued in pursuance and conformity with these and other documentary evidences of responsibility and good standing of the incorporators and of their fictitious creation, requiring that each share of stock

should be issued and sold to the incorporators for the sum of $100, in cash, "so as to net the applicant the full amount of the selling price thereof." Since the corporation had no balance in the bank at its inception, and none after the stock was issued and disposed of, it results that the permit was flagrantly ignored and violated in its most essential requirement, and that the public in dealing with a concern ostensibly having a cash capitalization of $25,000 on hand, would be compelled to resort for satisfaction of corporate obligations to the unexplained ultimate balance of $6.10, which was deposited after the evident "wash" had been consummated.

 It is argued, however, that appellant was not alleged to have been an officer or employee of the corporation, or to have been charged with the duty of participating in the issuance or sale of stock; that although there was evidence that he was a director, and treasurer, and that he participated in meetings of directors which resolved that the stock should be sold for cash, this all tended to show compliance by him with the requirements of the permit, and that he cannot be held chargeable with knowledge of the contents of the accounts. The effect of this argument is that there is no evidence that appellant received the share of stock issued in his name, or that he took any part in the alleged violation of the terms of the permit. In this he attempts to rely upon *People* v. *Blackman*, 127 Cal. 248 [59 Pac. 573], which merely holds that books and records kept by a deceased accountant, over which it did not appear that the defendant had supervision or control, were not sufficient evidence of embezzlement of funds therein appearing to have been illegally converted. The record before us discloses that appellant was attorney for the Fishelton Farms, Inc., that he organized it, signed and acknowledged its articles of incorporation, stating that he subscribed $100, and that he was a stockholder to the extent of one share; that he prepared the application for permit to issue and sell the stock for net cash, stating therein that he was treasurer, and a director, and making the articles of incorporation a part thereof. The by-laws of the corporation, which bear the legal form and phraseology creditable to an experienced lawyer, recite for the information of the corporation commissioner: "The treasurer shall receive and keep all the

funds of the corporation and pay them out only on the check or warrant of the president countersigned by the secretary,'' and are also made a part of the application. As secretary of the corporation, appellant had possession of its books and records, and delivered them to an auditor who examined them, and from whose testimony as a witness in the case the financial manipulations of the incorporators are detailed herein. We think the evidence from which the jury may have concluded that appellant participated in the offence, by aiding in the issuance of stock to himself as well as to others, without consideration and in violation of the permit, was ample. It was by no means wholly circumstantial, and in its entirety it cannot be said as a matter of law insufficient to convince an unbiased mind beyond a reasonable doubt that appellant as attorney for the others was cognizant of, and directed, the machinations of their unlawful scheme, and that he received stock of the corporation without paying for it.

■ It is insisted that the application for permit, and the permit to issue and sell the capital stock in question, were improperly admitted in evidence over objections that they were incompetent, irrelevant and immaterial, and that no foundation for their introduction had been laid. The auditor of the corporation commission testified that he had been such for two and a half years, that he made an examination and investigation of the books and records of the corporation in controversy, and that he had with him and was then and there producing the files of the Fishelton Farms, Inc., from the official archives of the corporation commission. The application and permit were stamped, respectively, ''Received State Corp. Dept.,'' August 13, 1924, and September 5, 1925. Appellant contends that there is no provision in the statute authorizing the employment of an auditor by the commission, and that these documents were therefore not offered ''by the original, or by a copy, certified by the legal keeper thereof,'' as provided by subdivision 6 of section 1918 of the Code of Civil Procedure, nor brought into court by a legal officer of that department. The witness swore, however, that they were the files of both the Sacramento and Los Angeles divisions of the department; that he knew one of them to be the application filed by Fishelton Farms, Inc., with the corporation commission,

and that he knew the other to be the permit issued by that commission to said corporation. Section 16 of the statute authorizes the commissioner to employ such clerks and deputies as may be necessary to discharge the duties of his office, and since the witness was admittedly employed as a bookkeeper or accountant, we are unable to perceive any ground for disqualifying him because he may have been an expert, or for doubting his knowledge of the genuineness of the records of his superior. Under the existing circumstances the documents in controversy did not require certification by their legal keeper, since they were the original files, in the hands of a member of the department, regardless of the name by which such a clerk or deputy might be designated by the commissioner. There is no merit in this contention.

■ Appellant next contends that there is no legal evidence of the fact that he was secretary of the corporation, or that any of the corporate records comprising exhibits heretofore mentioned were its property, or were under his control, or were true and correct, and that they should not have been admitted over objections interposed upon the foregoing grounds. A witness, J. K. Culton, testified that as an auditor employed by the corporation to examine its books he received them from appellant, who then indicated that he had been secretary by stating that he had theretofore resigned from that office. The minute-book bore appellant's name as such secretary, repeatedly signed to minutes of directors' meetings and the journal and ledger contained entries of items recited earlier in this opinion which but for the absence of an actual money consideration exactly comport with the numbers of shares of stock and amounts of money set forth in the application for permit, a part of which are the articles of incorporation under oath of the incorporators, including Bedford. Whether or not appellant made the entries therein, or caused them to be made, that he was secretary cannot under all of the evidence be seriously questioned .and that he was treasurer is borne out by the records of which he at times had custody and control. Hence, he was at least responsible for their accuracy, and for the funds of the corporation as prescribed by the by-laws. Appellant's signature was identified upon certain exhibits by an expert, and as we have observed, all of their dates and other entries correspond without an exception with the

objects, purposes, methods and interests outlined by the articles of incorporation signed by appellant, and which he concedes were properly received in evidence. That the records of the corporation were correct in every respect need not, and in many instances cannot, be established. (*Patrick* v. *Tetzlaff*, 46 Cal. App. 243 [189 Pac. 115].) However, appellant does not attempt to advance the theory that any of them were false, and in view of many unavoidable facts and circumstances we think they were properly received in evidence as official and genuine recitals of the corporate acts and of appellant's participation therein. It is asserted by appellant in his briefs that Culton's testimony was stricken out, but reference to the ruling discloses that only "the testimony of Mr. Culton as to Mr. Luke's signature," as secretary, to the minutes of a special meeting of September 30, 1925, was stricken from the record.

It is also advanced as a ground for reversal that the prosecution should first have shown, as a foundation for the reception of such testimony and documentary evidence, that they were kept in the regular course of business, by persons having personal knowledge of the transactions, or by those who obtained such knowledge from memoranda regularly made by persons authorized and invested with the power and duty to furnish the latter.

As to the records of Fishelton Farms, Inc., it appears that the minutes of the corporate proceedings and entries of moneys claimed to have been received and expended, were obtained from the original incorporators who at convenient and appropriate intervals were officers in charge, custody and control of them. That appellant organized the corporation is undisputed, and his name appears as the attorney who filed the application for permit. The application contained, as exhibits, a copy of the articles and by-laws. He delivered to an auditor, when asked for the records of Fishelton Farms, Inc., the books from which were taken the entries of items constituting the evidence before us, at that time admitting that he had been secretary, and no question appears to have arisen as to the authenticity of such entries. They reflect a complete consummation of the issuance and sale of the exact number of shares, and amounts of proceeds therefrom, outlined by the application to the corporation department. All of the exhibits bear the name of appellant

as incorporator, director, secretary and treasurer, and his only complaint is that the book entries were not admitted to have been made by him or under his direction. We think, however, that their former custody, and their perfect harmony, cause all of the exhibits to so completely dovetail that the disputed ones are, as evidence of corporate operations, inseparable from those which cannot be denied, and that they were clearly admissible.

■ The bank records, also, were properly received in evidence. The foundation was laid by two witnesses. The witness Thompson testified that he was cashier of the San Bernardino Valley Bank at the time of the trial, and produced a number of documents, later admitted in evidence and marked 12 to 22, inclusive, which he swore were parts of the corporation account with his institution. This witness not having been cashier or otherwise having had supervision of the bank records at the time they were compiled, could do no more than state that they were such. However, it appears from the testimony of the witness Haubert that they were made in the regular course of business, by clerks and tellers who had been instructed as to the custom and methods of the bank when they were employed. He was placed upon the stand and completed the laying of the foundation by testifying that he was cashier and was in charge and control of the records during the period when they were made up. He had had charge and general supervision of the bank's working forces and accounts. Many of these exhibits indicate on their face their connection with the bank. Exhibits 12 and 13 do not so show, but the foundation for their introduction was laid as above indicated, and each was explained and read into the record. ■ Under such circumstances they will be presumed to have been correct, and the evidence will be taken as true. (*People* v. *Woolacott*, 80 Cal. App. 275 [251 Pac. 826].)

■ Both classes of exhibits might properly have been deemed by the trial court competent as part of the *res gestae*. They represented, as contended by appellant, honest transactions; but their fallacy lay in the fact that none of the moneys which they so represented had any existence. The purpose of the Corporate Securities Act is to shield the purchasing stockholder from fraud, and to protect merchants and tradesmen who may deal with the corporation

from loss through extended credit. All of the statements, representations, book entries and stockholdings, from the initial step in organizing the corporation to the time of auditing its accounts, tallied and harmonized, and were apparently regular. But the entries, sham and meaningless, were created by reciprocating deposits and withdrawals at the bank, without the use of funds, which perpetrated a fraud upon the public and upon the corporation department, and thus constituted a violation of the statute, since there was not the slightest prospect of financial security or return to the corporation or to its prospective constituents or creditors. The exhibits were therefore instruments by means of which the defendants accomplished the fraud at which the Corporate Securities Act is directed, and all of the evidence consisted of circumstances, facts and declarations growing out of the main fact, contemporaneous with it, and serving to illustrate its character. Each case turns upon its own circumstances, and while the evidence in the instant case was by no means entirely circumstantial, the fact of incorporation followed by uninterrupted insolvency, accomplished by interlacing credits and debits which were the cause, and a part of, the fraud, and were things done during the progress and accomplishment of the offense. (*Walker* v. *State*, 137 Ga. 398 [73, S. E. 368] ; *Illinois Cent. R. Co.* v. *Houchins*, 125 Ky. 483 [101 S. W. 924] ; *Hermes* v. *Chicago & N. W. Ry. Co.*, 80 Wis. 590 [27 Am. St. Rep. 69, 50 N. W. 584] ; *Coffin* v. *Bradbury*, 3 Idaho (Hasb.), 770 [95 Am. St. Rep. 37, 35 Pac. 715].)

The jury and the trial judge had before them all of the facts and circumstances, observed the witnesses on the stand, and took the case as a whole. Under an instruction that neither of the defendants could be convicted upon circumstantial evidence alone, unless all of the circumstances concurred to show that the crime charged had been committed by him, excluding to a moral certainty and beyond a reasonable doubt every other conclusion than that of guilt, appellant was convicted. As heretofore stated, the evidence was not wholly circumstantial, and upon the record before us we are satisfied that there was no prejudicial error or miscarriage of justice.

The judgment and order appealed from are affirmed.

Works, P. J., and Thompson (Ira F.), J., concurred.